The **PROCTOR & GAMBLE MANUFACTURING COMPANY**

v.

**INDEPENDENT OIL AND CHEMICAL WORKERS.**

Civ. A. No. M-74-263.

United States District Court,
D. Maryland.

Nov. 25, 1974.

Thomas B. Eastman and Ober, Grimes & Shriver, Baltimore, Md., and Guy Farmer and John A. McGuinn and Patterson, Belknap, Farmer & Shibley, Washington, D. C., for plaintiff.

Sidney Blum, Baltimore, Md., for defendant.

## OPINION

JAMES R. MILLER, Jr., District Judge.

### I

■ This action is alleged to arise under 29 U.S.C. § 185(a) (Section 301 of the Labor Management Relations Act of 1947), which provides:

> "Suits for violation of contracts between an employer and a labor organization · representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."

This subsection has authoritatively been held to grant jurisdiction to the federal courts to determine whether or not an arbitrator, acting pursuant to a collective bargaining agreement, exceeded his authority in making an award. Torrington Co. v. Metal Prods. Workers Local 1645, 362 F.2d 677 (2d Cir. 1966); Harris v. Chemical Leaman Tank Lines, Inc., 437 F.2d 167 (5th Cir. 1971); Under-

wood Corp. v. Local 267, Intern. Union of Elec., Radio and Mach. Workers, AFL–CIO, 171 F.Supp. 102 (D.Conn. 1957); Reece v. Westmoreland Coal Company, 340 F.Supp. 695 (W.D.Va.1972). See also Textile Workers Local 1386 v. American Thread Co., 291 F.2d 894 (4th Cir. 1961); Safely v. Time Freight, Inc., 307 F.Supp. 319 (W.D.Va.1969), aff'd, 424 F.2d 1367 (4th Cir. 1970); H. K. Porter Co. v. United Saw, File, & Steel Prods. Workers Local 22254, 333 F.2d 596 (3d Cir. 1964). Since the crux of this case is the question of whether or not the award of the arbitration board of which Procter & Gamble Manufacturing Company (hereinafter "Company") complains was issued within the scope of the authority granted to the board by the collective bargaining agreement between the Company and Independent Oil & Chemical Workers (hereinafter "Union"), the motion to dismiss for lack of jurisdiction, filed by the Union under Rule 12(b)(1), F.R.Civ.P., is without merit, there being no question here that the industry involved affects commerce.

## II

The Union has filed a motion to dismiss under Rule 12(b)(6), F.R.Civ.P., for failure to state a claim as well as a motion for summary judgment under Rule 56. The Company has similarly filed a motion for summary judgment. These motions will be considered together.

### Facts

The Union filed a grievance against the employer (Company) on behalf of a Union member, one Jane Mrockowski. Miss Mrockowski was first hired by the Company on June 7, 1971, was terminated (allegedly for lack of work) on November 19, 1971, reemployed on February 14, 1972, terminated again (allegedly for the same reason) on May 5, 1972, reemployed on May 15, 1972 and finally terminated on August 29, 1972. The collective bargaining agreement (Agreement) in force at the time the grievance arose provides in Art. XIV, Sec. 3, that:

"There shall be a six month's probationary period during which there shall be no seniority, but after this probationary period, seniority shall be counted from the date of last employment."

While employed by the Company, Miss Mrockowski (Grievant) was alternatively employed as a "Special Pack Collator" and "Bottle Feeder," both jobs requiring rapid and continuous arm and shoulder motion.

In April 1972, Grievant complained to the plant physician, Dr. Chilimindris, a general surgeon, of right arm and shoulder discomfort symptomatic of thoracic outlet syndrome, a condition resulting from a compression of the nerves leading from the spine to the shoulder and arm. It was subsequently determined by Dr. Hitzrot, Grievant's family physician, that Grievant had a congenital cervical rib on her upper spine. On June 10, 1972, Grievant was hospitalized and soon thereafter underwent surgery performed by Dr. Chilimindris (allegedly acting as a private physician) and by Dr. Finney, a consulting neurosurgeon. This surgical procedure involved the removal of a portion of the right cervical rib and division of the scalenus muscle to alleviate the nerve compression.

Grievant returned to Company's plant on August 29, 1972, after her recuperation from surgery and was examined by Dr. Chilimindris (as plant physician), who placed on her medical record the notation:

"Miss Mrockowski is returning to work today following surgery for thoracic outlet syndrome. Her job prior to surgery was bottle feeding and collating, both of which involved constant motion and strain on the arms. Because of the high incidence of recurrence of symptoms of the condition for which she was operated on, I strongly recommend that she should not engage in this type of working ac-

tivity since this I believe is detrimental to her health. I have read this to the employee in her presence." .

Thereupon, the Company terminated Grievant and the following notation was entered on her employment record:

"Jane returned for her return to work physically qualified after operation. The doctor determined that the repetitive type motions necessary for production jobs would cause a recurrence of her physical problems. *Jane is being terminated because she is not physically able to perform production work available in the plant.* The doctor did not restrict Jane from other kinds of work. Therefore, she is eligible for rehire for clerical, laboratory, or non-production type work." (Emphasis supplied).

On September 13, 1972, the Union filed a grievance stating:

"The company terminated employee Jane Mrockowski with bias and prejudice and in violation of Article XVIII, Sect. 3 of Contract dated 1/24/72."

Preparatory to an arbitration proceeding, the Company and the Union on March 13, 1973, executed a joint stipulation providing:

"In regard to the termination of employee Jane Mrockowski:

"1. The Union contends the Company violated Article XVIII, Section 2 of the Agreement dated January 24, 1972.

"2. The Company contends that termination for health reasons was in compliance with Article XVIII, Section 3, of the Agreement, dated January 24, 1972."

Article XV, Section 1, Step 4, of the Agreement provides, in pertinent part, that:

"The *grievance as stipulated in writing jointly by the Employer and the Union shall set forth the provision or provisions of the contract which are involved,* and shall be prepared before the Board of Arbitration convenes. *The Board of Arbitration shall act*

*only on the stipulation and shall neither add to nor subtract from the stipulated grievance or the terms of the Agreement."* (Emphasis supplied).

Under Article XV, the Board's decision is final and binding on both parties.

Article XVIII of the Agreement, headed "Termination," provides as follows:

"Section 1—Notice of Termination. Before any employee is terminated for cause the Employer shall give such employee an oral statement of the cause of such termination and afford the employee an opportunity to state his side of the case, in the presence of his or her steward and/or an executive officer of the Union, unless the employee states to the Employer representative that he or she prefers no Union representative.

"Section 2—Warning Notice. No employee shall be suspended, demoted, or discharged except for a major offense without first having been notified that a repetition of the offense, or any other violation of Employer rules, will make him liable to suspension, demotion or discharge. Such notice shall be given in the presence of the Union representative at the request of either the employee, the Employer, or the Union.

"Section 3—Termination of Employment. In the case of termination of employees for reasons other than infraction of rules and regulations of the Employer, such as inefficiency or reduction of force, the Employer agrees to notify the employee a week in advance of the termination date, provided the employee has been continuously employed for at least sixty (60) days. In addition to one week's termination notice, an employee will be entitled to receive any vacation pay to which he is entitled and which he has not yet received. In the event of failure to give the one week's termination notice, the Employer shall provide in addition to any vacation pay to which the employee is entitled but

has not yet received, a severance payment equivalent to one week's wages at base rate."

Miss Mrockowski received and cashed the Company's check for one week's severance pay. The Union vice-president who executed the stipulation (Mr. Bramble) testified before the Board that the reference to Article XVIII, Section 3, in the original grievance was an error and that the Union relied on Article XVIII, Section 2, because it believed Grievant's termination was due to her "walking picket duty" during a strike in 1971.

The Board's decision and award of March 1, 1974 commenced with consideration of the question of the Board's own authority to resolve all the issues raised. Before the Board, as here, the Company contended that the Union, by stating in the stipulation that its claim arose under Article XVIII, Section 2, was precluded from asserting a violation of Section 3 and, further, that the Company's reference to Section 3 in its phrasing of the stipulation did not subject that provision to the Board's consideration for purposes of a possible affirmative finding of violation because it was only a "defensive stipulation." Addressing the question of the scope of its authority to resolve the issues presented by the joint stipulation, the Board's decision stated:

"Although the Agreement confines the Board to the grievance 'as stipulated in writing jointly by the Employer and the Union,' in this case the only 'joint' stipulation was that the grievance concerned the termination of the grievant's employment. To be sure, the Company has contended that she was terminated pursuant to Section 3 (termination for reasons other than infraction of rules and regulations) and not pursuant to Section 2 of Article XVIII. *In the Board's view, however, the Union was not required in its statement of the grievance or in its phrasing of a proposed stipulation to identify the precise Sec-*

*tion under which the Company claims to have proceeded. In fact, not any of the three Sections of Article XVIII is necessarily violated in cases in which the Union challenges a discharge as not being for just or proper cause.* Section 1 of that Article provides for notice and hearing in the event of termination 'for cause,' Section 2 for a warning preceding discharge for violation of rules, and Section 3 for a week's notice or a week's severance pay in case of termination for reasons other than infraction of rules. *There has never been any suggestion in this case that the Company violated any of the affirmative requirements of Article XVIII.* What is involved here, as all parties were at all times fully aware, is *whether the grievant was discharged for cause. Nowhere in the Agreement is there any specific language limiting the Company's right to discharge, except in Article XVIII, Section 1, imposing a standard of 'cause.'* However, the Board believes that protection against discharge except for just or proper cause is the understood underlying premise of the termination provision contained in Article XVIII. The Company suggested at the hearing that Section 3 of that Article permits terminations for reasons 'other than cause,' and apparently would include illness or physical inability to work as within that category. But this reading, in the Board's view, *equates 'cause' with 'fault,' a reading not warranted by the Agreement or by common parlance. Illness may be a 'cause' of discharge or termination just as unsatisfactory work or violation of rules or even union activity may be 'causes.'*

*"In the Board's view, therefore, the fact that the Union in its proposed stipulation alleged a violation of Article XVIII, Section 2, does not preclude the Board from determining whether the grievant was discharged for cause.* Indeed, *If the grievant had*

*in fact been discharged for union activity (an allegation which the Board finds unsubstantiated* on this record), there would be no reason for finding that the violation would be of either Section 2 or Section 3 of Article XVIII." (Emphasis supplied).

The Board went on to state the substantive issue of the case as " . . . whether the Company had just cause to terminate an employee who was physically able to do the job because of the over 60 percent possibility that at some future time within a period of as long as twenty years she might prove unable to continue on the job without further surgery." (Bd. Dec., p. 10). Answering that question in the negative, the Board sustained the grievance and ordered the reinstatement of the Grievant with back pay.

This suit followed to set aside the arbitration award.

### Scope of Judicial Review

The Agreement provides in Article XV, Section 1, in pertinent part, as follows:

"A grievance is defined to be *any difference* between the Employer and any employee . . . *as to any matter involving the interpretation or application* of *any provision of this Agreement* . . . . Such grievances *shall be adjusted* according to the following procedures:

\* \* \* \* \* \*

"Step 4—. . . any grievance having to do with the *interpretation or application of any provision of this Agreement* may be submitted to a Board of Arbitration." (Emphasis supplied).

The *Steelworkers Trilogy* [1] has established the parameters of judicial review of arbitrators' awards under similar grants of power to boards of arbitration.

In *Warrior & Gulf,* one of the *Trilogy,* the Supreme Court said in part at 363 U.S. 584–585, 80 S.Ct. 1354:

*"In the absence of any express provision excluding a particular grievance from arbitration, we think only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail, particularly where, as here, the exclusion clause is vague and the arbitration clause quite broad.* Since any attempt by a court to infer such a purpose necessarily comprehends the merits, *the court should view with suspicion an attempt to persuade it to become entangled in the construction of the substantive provisions of a labor agreement, even through the back door of interpreting the arbitration clause, when the alternative is to utilize the services of an arbitrator.*

"The grievance alleged that the contracting out was a violation of the collective bargaining agreement. There was, therefore, a dispute 'as to the meaning and application of the provisions of this Agreement' which the parties had agreed would be determined by arbitration.

*"The judiciary sits in these cases to bring into operation an arbitral process which substitutes a regime of peaceful settlement for the older regime of industrial conflict.* Whether contracting out in the present case violated the agreement is the question. It is a question for the arbiter, not for the courts."

The limits of the deference which courts must give to the awards of arbitrators under collective bargaining agreements were discussed in *Enterprise Wheel & Car Co.,* another of the *Trilogy.* There, employees were discharged after they left their jobs in pro-

---

1. United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Co., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

**220**

test against the discharge of a fellow employee. The arbitrator, acting under a collective bargaining agreement which had expired prior to his award but after the challenged discharges and which contained a provision that disputes as to its "meaning and application" should be submitted to arbitration, ordered reinstatement with back pay less a 10-day suspension. The District Court ordered the recalcitrant employer to comply with the award. The Court of Appeals reversed [at 269 F.2d 327 (4th Cir. 1959)], holding the award unenforceable due to the prior expiration of the collective bargaining agreement. The Supreme Court reversed, holding that the judgment of the District Court (upholding the award) should have been affirmed with a modification to clear up a minor ambiguity in the award. The Court stated, 363 U.S. at 596–597, 80 S.Ct. at 1360:

*"The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements.* The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards. As we stated in United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, . . . the arbitrators under these collective agreements are indispensable agencies in a continuous collective bargaining process. They sit to settle disputes at the plant level—disputes that require for their solution knowledge of the custom and practices of a particular factory or of a particular industry as reflected in particular agreements.

"When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution of a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations. *The draftsmen may never have thought of what specific remedy should be awarded to*

*meet a particular contingency. Nevertheless, an arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not sit to dispense his own brand of industrial justice. He may of course look for guidance from many sources, yet his award is legitimate only so long as it draws its essence from the collective bargaining agreement. When the arbitrator's words manifest an infidelity to this obligation, courts have no choice but to refuse enforcement of the award."* (Emphasis supplied).

The Court concluded, 363 U.S. at 598–599, 80 S.Ct. at 1361:

"The collective bargaining agreement could have provided that if any of the employees were wrongfully discharged, the remedy would be reinstatement and back pay up to the date they were returned to work. Respondent's major argument seems to be that by applying correct principles of law to the interpretation of the collective bargaining agreement it can be determined that the agreement did not so provide, and that therefore the arbitrator's decision was not based upon the contract. The acceptance of this view would require courts, even under the standard arbitration clause, to review the merits of every construction of the contract. This *plenary review by a court of the merits would make meaningless the provisions that the arbitrator's decision is final, for in reality it would almost never be final.* This underlines the fundamental error which we have alluded to in United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, [80 S.Ct. 1343,] As we there emphasized, *the question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which was bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of*

*the contract is different from his."* (Emphasis supplied).

■ The Fourth Circuit has very recently recognized the continuing vitality of the doctrines of the *Steelworkers Trilogy* and has reaffirmed that the scope of judicial review does not include the merits of an award, but is limited to the narrow issues of whether the arbitrator's decision "drew its essence" from the Agreement, or whether the grievance procedure was a sham, substantially inadequate or substantially unavailable, Jim Crigger et al. v. Allied Chemical Corporation, 500 F.2d 1218 (4th Cir., 1974). In that case, the Fourth Circuit rejected an argument that the arbitrator's interpretation of the collective bargaining agreement was so incorrect as to amount to a dispensing of his own brand of industrial justice, stating that the record showed that the arbitrator ". . . made [after] a careful, reasoned attempt to construe a hazy provision of the contract." 500 F.2d at 1219.

### Discussion

With these principles in mind, the court now turns to resolve the specific contentions made here.

### A.

The Company's first and central contention is that the arbitrators clearly went beyond the scope of the joint stipulation in deciding the case on a basis other than an interpretation or application of Article XVIII, Section 2, of the Agreement. Article XV, Section 1, Step 4, provides for arbitration of ". . . any grievance having to do with the interpretation or application of any provision of this Agreement . . . ." Step 4, as noted hereinbefore, also provides for the preparation of a joint stipulation setting forth the contractual provision[s] involved and limiting the Board to acting only upon the stipulation and the Agreement. The stipulation here, which "stipulated" nothing except that Grievant had been terminated, presented no single clear question to the Board. Rather, it presented two contentions, not necessarily mutually exclusive (since the termination might have resulted from a combination of two reasons) and citing contract provisions which failed to set forth any guidelines for justifying such a termination. The Agreement itself provided no direction for the Board when faced with a stipulation in non-compliance with Step 4's mandate. As it turned out, the Board was unable to agree with either the Union or the Company contention in the stipulation. The Board, therefore, was faced with the choice of either delaying the proceedings and sending the parties back to draft a new stipulation or reducing the existing defective stipulation to its lowest common denominator (*i. e.* whether the termination was appropriate under *all* the facts).

■ The decision by the Board to proceed with the stipulation presented was the type of procedural question which the Supreme Court held, in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), was best left to the arbitrator. *Accord,* Local No. 824, etc. v. Brunswick Corp., 342 F.2d 792 (6th Cir. 1965). In *John Wiley,* the employer refused to submit a dispute to arbitration for the reason, *inter alia,* that certain pre-arbitration grievance resolving steps required by the contract had not been carried out and *could* not be carried out due to the merger of the original employer with the defendant there. The Court held that the failure to "exhaust" pre-arbitration remedies was not a question of "substantive arbitrability" for the courts, but a matter of procedure for the arbitrator. *John Wiley, supra,* 376 U.S. at 555–558, 84 S.Ct. 909, 11 L.Ed.2d 898.

■ It has since been held that the *John Wiley* result as to procedural issues is not restricted to those factual situations in which the merits and the procedural issues are inextricably intertwined. Tobacco Wkrs. Int. U., Local 317 v. Lorillard Corporation, 448 F.2d 949 (4th Cir. 1971); Rochester Telephone Corp. v. Communication Workers,

**222**

340 F.2d 237 (2d Cir. 1965). Where, as here, the Agreement lays down no procedure for dealing with an inartfully drawn stipulation, the Board is free to establish any procedure which is not unreasonable and which does no violence to the express provisions of the Agreement. Reducing the stipulation to its "lowest common denominator" and proceeding from that point was exactly such treatment by the Board.

■ Even assuming, *arguendo*, that an issue of "substantive arbitrability" rather than procedure is raised in this contention, the Company's argument is not compelling. The Company was not required, in the stipulation, to cite any provision of the Agreement beyond that invoked by the Union. Had the Company wished to limit the dispute to whether Grievant's termination was the result of her picketing, it could merely have denied the Union's contention. Instead the Company chose to raise an "affirmative defense" of physical infirmity. Whether, in so doing, it "opened the door" to substantive evaluation of the medical evidence seems clearly a "procedural" question under the *John Wiley* doctrine. The Company's stipulated contention speaks for itself and it will not be heard to complain of the foreseeable consequences of its own "inartful drafting." Accordingly, the finding that the Company had not violated Article XVIII, Section 2, did not end the matter since Article XVIII, Section 3, was still in issue.

■ ■ The Company also objects to the Board's reference to Article XVIII, Section 1, of the Agreement. In this, the Company misapprehends the Board's rationale. (Bd. Dec. p. 5). The Board held that the underlying premise of "just or proper cause" permeated the entirety of Article XVIII. In reaching that conclusion by interpreting Article XVIII, Section 3, *in light of* Section 1, the Board did not "add to" the stipulation. While the Board was limited by the Agreement to acting on the stipulation, common sense dictates that the Board need not interpret contract provisions in a vacuum, but rather in the context of the entire Agreement. Indeed, the Company seeks to have this court interpret "for cause" in light of Article XII of the Agreement and, based thereon, to hold that the Board misconstrued that crucial phrase. While it is concededly difficult to conceive of what manner of termination could be "for reasons other than cause" as contemplated by Article XII, Section 7, if "cause" is as broad as the Board concluded it was, it is not the function of this court to second guess the contractual interpretation of the arbitrators when it is their informed judgment for which the parties have bargained. Since "cause" is nowhere clearly defined in the Agreement, this court cannot say with certainty that the Board's definition thereof was clearly erroneous. Unlike *American Thread Co., supra,* relied upon by the Company, neither the stipulation nor the relevant provisions of the Agreement here are in "clear, plain, exact and unambiguous terms." When such ambiguities, and outright confusion, as were thrust upon the Board in the instant case exist, the court must heed that central concept of *Warrior & Gulf, supra,* that doubts should be resolved in favor of coverage by the arbitration clause. See also, Local Union 24, etc. v. Wm. C. Bloom & Co., 242 F. Supp. 421 (D.Md.1965).

■ Plaintiff next contends that the Board majority clearly exceeded the scope of the submission by ordering reinstatement and back pay while simultaneously finding that the Company had violated no explicit provision of Article XVIII. This contention raises the question of whether the "understood underlying premise" of *just* cause found by the Board to permeate Article XVIII is an "addition" to, rather than an "interpretation" of, that portion of the Agreement. If the premise is an "addition" to the terms of the Agreement, the Board would have been prohibited by Article XV, Section 1, from taking cognizance thereof. Interpretation, on the

other hand, is expressly made the Board's task.

The Board's decision notes the absence in the Agreement of any standard by which a termination was to be judged, other than "cause" in Article XVIII, Section 1. No argument was made by the Company that it had the absolute authority to terminate an employee without ever having its action reviewed by an impartial decision maker. Quite the contrary, at the hearing before the Board, the Company presented a great deal of evidence in support of its termination of Grievant. Once the Board had determined that the appropriateness of the termination was before it, it had to measure the facts of the instant case by some standard. The Board seized upon the word "cause" and "fleshed it out" in an attempt to fashion therefrom a workable standard by which to judge Grievant's termination. "Just cause" is a common standard for termination in collective bargaining agreements. *See e. g.* Local Union No. 721, etc. v. Needham Packing Co., 376 U.S. 247, 84 S.Ct. 773, 11 L.Ed.2d 680 (1964); Lynchburg Foundry Co. v. United Steelworkers, 404 F.2d 259 (4th Cir. 1968). Here again, the court must heed the Supreme Court in *Warrior & Gulf, supra,* 363 U.S. at 581–582, 80 S.Ct. at 1352:

> "The labor arbitrator's source of law is not confined to the express provisions of the contract, as the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it."

In essence, the Board, having only the word "cause" to guide it, applied the "industrial common law" to reach the conclusion that "cause" meant "just cause." Whether the Board was correct in its assessment of the industrial common law is not a matter for this court to decide.

In support of its contention that the Board's use of "just or proper cause" as a standard was erroneous and an "ad-

dition" to the Agreement, the Company cites Article XIV, Section 2, titled "Basis for Promotions, Transfers or Layoffs," which provides in part, that such moves shall depend upon seniority, ability, and merit, and further provides:

> "In all such cases seniority shall rule, provided that ability and merit are equal, it being understood that the Employer shall be the judge of ability and merit."

This clause clearly implies that the Company is the judge of *relative* ability and merit, but does not invest the Company with absolute discretion as to the ability of any single employee. Unlike her previous "terminations," Grievant was *not* terminated in August, 1972 in lieu of being laid off. A "layoff" implies insufficient work to employ the number of workers presently on the payroll. In August, 1972, Grievant was terminated, according to the Company itself, for medical reasons, not due to insufficient work. Article XIV, Section 2 appears irrelevant to this type of termination, or, at the very least, a reasonable arbitrator in the scope of his interpretative capacity could find it so.

An argument not unlike plaintiff's was rejected in Operating Engineers Local No. 3 v. Crooks Bros. Tractor Co., 295 F.2d 282 (9th Cir. 1961). There an employee was discharged for insubordination and the operative collective bargaining agreement made the employer ". . . the sole judge of the qualifications of its employees." The Union brought suit to compel arbitration of the termination, but the district court ruled that insubordination bore on a worker's qualifications, that the employer was the sole judge thereof, and denied an order compelling arbitration. The Court of Appeals reversed, holding that whether "qualifications" included insubordination was a debatable question the arbitration of which was not excluded by the express language of the agreement with the clarity essential under *Warrior & Gulf.* Likewise, in the instant case (and assuming that the term "Layoffs" includes terminations),

had the Company's determination of "ability" been based upon Grievant's physical condition *at the time of her termination,* rather than on the possibility of future injury, its argument would be more compelling. But on the facts here, even assuming the Board had concluded that Article XIV, Section 2, applied to this termination, it need not have found that Grievant's termination was based upon a determination of her "ability," since only Grievant's *future* ability to do the job was questioned by Dr. Chilimindris. Thus, so long as the Board did no violence to the express provisions of the contract, the policy of judicial deference to its interpretation must control.

### B.

▮ The Company also contends that the Board could afford Grievant no relief once it found that no explicit provision of the Agreement had been violated by the Company in terminating Miss Mrockowski. This contention is without merit. In *Warrior & Gulf, supra,* the employer's contracting out of maintenance work was held arbitrable even though it violated no explicit provision of the collective bargaining agreement. The Agreement itself, in the present case, requires only that the joint stipulation set forth the contract provisions "involved," not those allegedly "violated." Article XV, Section 1, Step 4.

### C.

The Company's third contention is that the Board's interpretation of the contract requirement relating to reference in the joint stipulation to the provision or provisions of the Agreement involved in the grievance has ". . . confused the real issue and resulted in a manifest infidelity" to Article XV, Section 1, Step 4. This is a mere rehash of the Company's first contention, rejected above.

As an illustration of the prior adherence of other arbitrators to a strict construction of the joint stipulation requirements of the Agreement, the Company has submitted the transcript of an arbiration hearing between the Company and the Union over the same Agreement wherein Impartial Arbitrator Lawrence E. Seibel held that he was bound to limit his consideration by the signed joint stipulation. Since this court knows neither the nature nor content of the stipulation before Arbitrator Seibel nor the additional contract provisions which the Union desired to have arbitrated by Mr. Seibel, nor even the basis of the dispute which led these parties to another arbitration, the transcript is not enlightening about any issue *sub judice.* This court has hereinbefore concluded that the Company itself introduced Article XVIII, Section 3, into the stipulation and that the necessity of citing in the stipulation each and every provision of the Agreement which a party expects the Board to consider is a procedural matter under the *John Wiley* doctrine. This third contention is of no more merit than the first.

### D.

▮ The Company's fourth contention is that the Board majority ignored Grievant's probationary status in holding that the Company must have had "just and proper cause" for terminating her. Essentially, the Company is arguing here that the Board applied an improper standard in evaluating the termination. This is not a case like Young v. Southwestern Bell Tel. Co., 309 F. Supp. 475 (E.D.Ark.1969), aff'd 424 F. 2d 256 (8th Cir. 1970), relied upon by the Company. In *Young,* the collective bargaining agreement specifically permitted non-probationary employees to arbitrate their discharges but did not allow probationary employees to do so. In the instant case the Agreement itself draws no such distinctions and, in fact, the only distinction expressly drawn in the Agreement is that probationary employees accrue no seniority during their probationary period.

The Board made no determination of whether Grievant was a probationary

employee. This court is certainly in no position to do so. The issue was contested at the arbitration hearing and the Agreement itself is by no means clear as to whether an employee must serve out his probationary period with six months' continuous employment. But even assuming that Grievant was a probationary employee, that would only go to the merits of the Board's decision, not to the arbitrability of her grievance.

The Company has cited persuasive authority for the proposition that, under current "industrial common law," the "just cause" standard does not apply to probationary employees. However, since the Agreement does not expressly define the standard to be used under the exact conditions involved here, the Board was left free to interpret and apply "cause" according to its own view of the "industrial common law" in the context of this Agreement and these facts. Even assuming that the Board misinterpreted the Agreement as to "cause," "probationary employee," or both, that would not vitiate the award. *American Thread Co., supra,* 291 F.2d at 896.

At the arbitration hearing, the Company apparently felt compelled to offer some explanation for the termination of the allegedly probationary Grievant. The Company at no time contended at the arbitration hearing that it could terminate Grievant arbitrarily and capriciously by virtue of her alleged probationary status. Furthermore, the express provisions of the Agreement relating to probationary employees are unenlightening as to the relationship, if any, of probationary status to termination. Under these circumstances this court cannot say that the failure of the Board to make a finding as to Grievant's status manifested a clear infidelity to either the text or the spirit of the Agreement.

E.

The next contention presented by the Company is that the Board's decision on the merits was palpably erroneous and based on a central error of fact. The First Circuit has recently held that "[w]here *the* 'fact' underlying an arbitrator's decision is concededly a non-fact and where the parties cannot fairly be charged with the misapprehension, the award cannot stand." *Electronics Corp. v. I. U. E.,* 492 F.2d 1255, (1st Cir. 1974). Assuming that in this Circuit an error of a central fact by the arbitrator will allow a reviewing court to vitiate the arbitrator's award,[2] it is clear that fact must be a matter which is objectively ascertainable, such as the absence of a pretermination suspension in *Electronics Corp., supra.* A mere misweighing of conflicting medical evidence would certainly not suffice.

Plaintiff suggests that the Board made a central error of fact in relying on the purported testimony of Dr. Chilimindris that there was a " 'substantial improvement in the grievant's condition' following the operation" (Bd. Dec. p. 12), and that Dr. Chilimindris never testified to the words quoted. It is apparent to one reading the Board's decision that the phrase quoted, "substantial improvement in the grievant's condition," was not intended by the Board to be a direct quote from Dr. Chilimindis's testimony but only to paraphrase the plant physician's statements.

The phrase itself comes from the arbitration decision in McGill Manufacturing Company, 58 L.A. 1120 (1972), which the Board was distinguishing on p. 12 of its decision. Dr. Chilimindris did testify in response to questions by Arbitrator Strongin (Tr. pp. 66–67) that Grievant's pain after the operation was normal post-operative pain rather than a continuation of her thoracic outlet syndrome. He further tes-

---

2. This assumption is of debateable validity. See Textile Workers Union of America v. American Thread Co., *supra,* 291 F.2d at 896; Jim Crigger et al. v. Allied Chemical Corporation, *supra.*

tified that the thoracic outlet syndrome was "taken care of" temporarily by the operation and that the cervical rib problem was corrected thereby (Tr. p. 85). Dr. Chilimindris also read from a letter concerning Grievant which he had written on July 6, 1972, in which he stated, *inter alia:* "The signs and symptoms of her disease were relieved following this operation." (Tr. p. 88). Arbitrator Strongin also ascertained from Dr. Chilimindris that, in August 1972, the plant physician had *not* told Grievant that she was physically unable to return to work but rather that a return to work at the plant would be bad for her health situation. (Tr. p. 105). The arbitrators could well have boiled this testimony down to two essential facts: (a) Grievant had a significant amount of pain prior to the operation as a result of thoracic outlet syndrome and (b) she was free of the signs and symptoms of thoracic outlet syndrome after the operation. The words, "[There was] a substantial improvement in the grievant's condition," constitute an appropriate paraphrase of such a factual finding.

Whether the Board's conclusion as to "substantial improvement" was the proper conclusion is clearly not a matter before the court. It suffices that there was some testimony by the doctor from which such a conclusion could have been drawn. There was no objectively ascertainable central error of fact (or "non-fact") in the conclusions drawn by the Board majority.

### F.

■ The Company objects to the admission into evidence and consideration by the Board of certain written medical opinions expressed by Dr. Finney with regard to Grievant's condition, to the effect that she was able to return to work in August, 1972. Dr. Finney did not testify at the arbitration hearing and the Company's attorney objected to the admission of these materials since Dr. Finney was not available for cross-examination. Even if the Board was in

error in admitting into evidence the written medical opinions of Dr. Finney, such a mistake would not vitiate the Board's decision. *American Thread Co., supra,* 291 F.2d at 896.

### G.

■ Finally, the Company argues against the "manifest unfairness" of judging its actions of August, 1972 with the benefit of medical evidence adduced thereafter. It contends that its actions should have been judged based on the information available to it at the time. No provision of the contract limits the type of award which the Board may make. The court, therefore, cannot find that the Board exceeded its authority in awarding back pay as well as reinstatement. *Lynchburg Foundry, supra.* Dr. Chilimindris testified that, *prior* to August 29, 1972 (the date Grievant was terminated), he had spoken to Dr. Finney about Grievant's physical condition and knew that Dr. Finney disagreed with his own opinion as to the probable consequences of Grievant's return to work. (Tr. p. 78). As plant physician, Dr. Chilimindris was the Company's agent and information received in the scope of his duties as agent was attributable to it. *Eitel v. Schmidlapp,* 459 F.2d 609 (4th Cir. 1972). Accordingly, the Company cannot validly argue that it had no knowledge that the medical opinion of Dr. Chilimindris it had on August 29, 1972, was in conflict with that of Dr. Finney.

### *Conclusion*

Defendant's motion for summary judgment should be granted. The Board did not clearly exceed the scope of its authority and the submission to it, nor was its decision and award without factual support. It is not for this court to say that the Board erred on the merits or that a different award would have been more appropriate. To do so would undermine the policy of deference set forth in the "Steelworkers Trilogy" and would encourage litigation over issues

with which courts are ill-prepared to deal.

A separate order will be entered granting defendant's motion for summary judgment and entering judgment for the defendant with costs.